*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ANNETTE H., | ) |
| | ) Supreme Court No. S-17290 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-16-00615 CN |
| v. | ) |
| | ) O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) No. 7414 – October 11, 2019 |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Peterson, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant. Laura E. Wolff, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

CARNEY, Justice.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her son, who was found to be a child in need of aid based on a hair follicle test positive for controlled substances. She argues that without proof that her drug use caused the child's exposure, there is no causal link between her conduct and any circumstances that may have

endangered the child. She also argues that the Office of Children's Services (OCS) did not make reasonable efforts to reunify the family because it failed to adequately accommodate her mental health issues. Because the record supports the superior court's finding that the child was in need of aid, and because OCS's efforts were reasonable under the circumstances, we affirm the termination of the mother's parental rights.

## II. FACTS AND PROCEEDINGS

### A. Removal And Emergency Petition

Annette H. is the mother of Justin H., who was born in March 2014.[1] Justin's biological father is unknown; DNA paternity tests excluded both the individual listed on Justin's birth certificate and Annette's partner Matthew. Annette and Matthew live together and had been the subjects of a number of reports to OCS, none of which were substantiated before October 2016.

In October 2016 OCS received a report alleging that Annette, Matthew, and possibly guests in their home were using and exposing Justin to methamphetamine. Two OCS workers went to their home that day. They saw Annette and Matthew through a window, but Annette and Matthew did not let them inside; the OCS workers did not see Justin. Later attempts to contact Annette and Matthew, including a welfare check by the police, were unsuccessful.

OCS obtained and executed a writ of assistance to gain access to the house and to Justin. According to one of the OCS workers, Annette and Matthew were uncooperative: Matthew was reluctant to let them into the house, and Annette was "screaming, yelling, [and] not letting go of the child." Police officers accompanying the OCS workers found a number of guests in the home, including a convicted sex offender not in compliance with registration requirements. Annette and Matthew stated that they

---

[1]     We use pseudonyms for all family members to protect their privacy.

were unaware of their guest's sex offense conviction. OCS found no evidence of drugs or paraphernalia in the house, and Annette and Matthew both declined hair follicle screening.

The OCS workers took Justin for a physical exam, which revealed no evidence of physical abuse, and a hair follicle test; OCS returned Justin to Annette pending the hair follicle results. Annette and Matthew agreed to OCS's request that they participate in 30 days of random urinalysis (UA) screening and obtained bus passes from OCS for transportation to the UAs. After they both missed their first two UAs an OCS worker visited them and persuaded them to allow oral swabs to test for drugs. Annette's test was negative; Matthew's was initially positive for amphetamines, but further testing revealed this to be a false positive. During the visit the OCS worker observed a bag of marijuana on a table but no other evidence that either of them was using drugs. Based on Matthew's apparent positive test result, OCS implemented a safety plan, placing Justin with Matthew's parents and allowing Annette and Matthew to have supervised visitation.

In early November 2016 OCS received Justin's hair follicle test results, which were positive for marijuana and methamphetamine. Annette and Matthew denied using methamphetamine but acknowledged that they sometimes allowed friends to stay with them; they suggested that one or more of their guests might have exposed Justin to methamphetamine.

OCS took emergency custody of Justin and filed an emergency Child In Need of Aid (CINA) petition the next day to adjudicate him as a child in need of aid and for temporary custody.[2] The petition alleged that Justin was a child in need of aid based

---

[2] *See* AS 47.10.142 (governing emergency custody); CINA Rule 6 (same).

on neglect, parental substance abuse, and parental mental illness.[3] OCS placed Justin in a foster home and arranged visitation for both Annette and Matthew. Annette stipulated to probable cause without admitting any of the allegations; the court adjudicated Justin a child in need of aid on all three alleged bases and awarded OCS temporary custody pending disposition.

### B. OCS Caseworkers' Efforts

#### 1. First caseworker

OCS assigned the first of three caseworkers to Justin's case soon after taking custody of Justin. That caseworker met with Annette to draft a case plan. The case plan listed as a "protective factor[]" that Annette loved Justin and could "take really good care of him" but included her acknowledgment that she could not "talk so well sometimes" and tended to "get overwhelmed." The case plan required her to obtain a substance abuse assessment and to follow its recommendations, obtain a mental health assessment, complete parenting courses, and comply with the visitation schedule set up for her and Justin. It noted that she was not willing to consider medication despite "admit[ting] that she has mental health issues." OCS referred Annette to programs for the substance abuse and mental health assessments as well as for other parenting, peer support, and education services. The caseworker gave both Annette and Matthew bus passes for transportation to visits and other appointments.

The first caseworker later testified that, although she "worked really well" with Annette, and although Annette was willing to work on her case plan, "her anxiety

---

[3]   *See* AS 47.10.011 (providing child may be found in need of aid if (9) "conduct by or conditions created by the parent . . . have subjected the child . . . to neglect," (10) parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant" resulting in "a substantial risk of harm to the child," or (11) parent "has a mental illness . . . of a nature and duration that places the child at substantial risk of physical harm or mental injury").

really made it difficult." To try to ease Annette's anxiety, the caseworker accompanied Annette to schedule a substance abuse assessment, but Annette did not return for the assessment because she did not want to go alone, and confidentiality requirements prevented Matthew from accompanying her. The caseworker next found a place where Annette could do a walk-in assessment to avoid having to schedule an appointment in advance, but Annette again did not complete the assessment because Matthew could not come with her. Annette declined the caseworker's offer to accompany her in Matthew's place to a meeting with a substance abuse treatment provider.[4]

### 2. Second caseworker

In April 2017 the case was assigned to another caseworker. That caseworker had difficulty establishing a relationship with Annette or engaging her in completing the tasks listed in the case plan, though Annette continued to consistently attend visits with Justin. The second caseworker later testified that she was unable to schedule appointments for assessments for Annette because Annette and Matthew would only meet with her for "about 15 minutes" before they would "walk out." At one point Matthew indicated that he would schedule the assessments without OCS's assistance, but the record does not indicate that he ever did so.

An adjudication trial was held over two days in late July 2017.[5] The court heard testimony from an OCS worker who had investigated an earlier unsubstantiated report of harm concerning Annette and Matthew, the OCS worker who had filed the emergency petition, and both caseworkers who had been assigned to Justin's case. They

---

[4] OCS did allow Matthew to be involved with some aspects of Annette's case plan, despite the caseworker's concern that he was "being controlling," because he would raise Justin with Annette if she regained custody.

[5] *See* AS 47.10.080(a) (governing adjudication hearings); CINA Rule 15 (same).

testified that Matthew had completed a substance abuse assessment but not followed up with treatment and that Annette had not begun any of the required substance abuse or mental health services, largely because she refused to attend appointments without Matthew. Annette continued to visit weekly with Justin, often without Matthew because OCS had limited his visits after DNA testing excluded him as Justin's biological father.

The superior court found that Justin was a child in need of aid based on neglect,[6] rejecting Annette's argument that a visitor to their home "inadvertently exposed" Justin to methamphetamine. The court stated that "if you're a parent, . . . [y]ou keep your kids away from people who are smoking meth[amphetamine] . . . [and] marijuana." The court also found that Justin was a child in need of aid based on parental substance abuse,[7] pointing to Annette's and Matthew's acknowledged past use of methamphetamine and marijuana and their refusal to participate in UAs, although the court acknowledged it was "unclear whether it's the parents who are using [methamphetamine] or whether there[] [are] other people who have been using it." Finally, as to parental mental health,[8] the court stated that "there's no evidence that it creates harm to [Justin]" but nevertheless found that Justin's developmental delays and exposure to drugs, along with Annette and Matthew's "lack of awareness of bringing . . . people into the home" who might endanger Justin, "could be indicative of mental illness." The court further found that OCS had made reasonable efforts to offer services to Annette and Matthew, including providing them with bus passes and referring them

---

[6]     *See* AS 47.10.011(9).

[7]     *See* AS 47.10.011(10).

[8]     *See* AS 47.10.011(11).

for assessments, mental health services, and UAs.[9] The court emphasized Annette's and Matthew's lack of engagement, suggesting that OCS might not have needed to remove Justin "had the parents cooperated, done the UAs, proven that it was someone else" who exposed Justin to drugs, and "tightened up their home policy."

OCS filed a predisposition report in October 2017 requesting custody of Justin for up to two years based on what it characterized as Annette's "untreated mental health issues, unstable finances, possible substance use, unstable home, and unsafe environment." The report stated that Annette "continued to refuse to meet with" the assigned caseworker or accept OCS's help with completing her case plan, though she regularly attended her visits with Justin, and that Matthew had stopped "actively engaging with OCS."

In early November 2017 the second caseworker updated Annette's case plan without Annette. The caseworker testified that she contacted Annette approximately one to three times per month, usually after her visits with Justin, to try to get her to work on her case plan, but that Annette was not engaged. The updated plan remained largely unchanged, requiring Annette to obtain substance abuse and mental health assessments, participate in UAs, and visit regularly with Justin.

Following a combined disposition and permanency hearing later that month,[10] the court committed Justin to OCS's custody for up to two years, finding that Justin remained a child in need of aid, that OCS had made reasonable efforts to provide support services, and that these efforts had been unsuccessful.

---

[9]    *See* AS 47.10.086(a) (requiring OCS to "make timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to . . . enable the safe return of the child to the family home").

[10]    *See* AS 47.10.080(f), (l) (governing permanency hearings); CINA Rule 17.2 (same).

### 3.     Third caseworker

In December 2017 Justin's case was transferred to a third caseworker, who met with Annette soon afterward. He later testified that because Annette did not agree with her case plan, she "refused to actually comply with [it]."

In January 2018 OCS filed a permanency report changing the primary goal from reunification to adoption because Annette was "not engaged in any services . . . to address any substance abuse or mental health issues." The court approved the permanency plan in February but, because Annette and Matthew had re-engaged with OCS shortly before the permanency hearing, the court did not require OCS to file a termination petition.[11]

The new caseworker did not alter Annette's case plan, but he referred her to additional agencies to obtain services because she had not gone to the agencies to which previous caseworkers had referred her. Because he believed that Annette's mental health issues likely would prevent her from attending a pre-scheduled appointment, he helped her find walk-in options for substance abuse and mental health assessments and provided her with bus passes. Even though Annette generally wanted to confer with Matthew before following up on referrals, the caseworker testified that she agreed to go to the new walk-in referrals without consulting Matthew. But she did not do so; she would "come up with reasons" why she had not completed the assessments, such as having to clean the house or Matthew's being busy.

This caseworker also attempted to assist Annette and Matthew with parenting courses they could complete at home with a booklet or online, as well as in person, but they never completed the courses. He also testified that, with Annette's

---

[11]     *See* AS 47.10.088(d)(1), (e)(1) (requiring OCS to petition for termination of parental rights to child in foster care for 15 of last 22 months absent compelling reason that petition would not be in child's best interests).

permission, he at first involved Matthew in their meetings because of the "supportive role" Matthew played for her. But he testified that Matthew later became "aggressive towards [him]" and would speak for Annette at the meetings. Eventually Annette stopped attending the meetings.

### C. Termination Trial

In June 2018 OCS petitioned to terminate Annette's parental rights to Justin. The trial was held in September. Various current and former OCS workers testified, including all three caseworkers for Justin's case as well as the visitation supervisor. The first two caseworkers acknowledged Annette's anxiety and testified to her unwillingness to meet with most service providers without Matthew present. The visitation supervisor also acknowledged Annette's mental health issues. She testified that Annette generally attended scheduled visits but was inconsistent in how much she would engage with Justin during visits, and that she would sometimes "get[] snappy" with him or "get[] really agitated and blow[] up" when redirected. She expressed concern that Annette would have difficulty parenting on her own. The third caseworker also testified to his efforts to assist Annette with her case plan. He stated that because Annette had not obtained any of the required assessments, OCS had not been able to even investigate any mental health or substance abuse issues she might have.

At the close of trial the court made oral findings that OCS had proven by clear and convincing evidence that Justin was subjected to neglect based on the positive hair follicle test;[12] that Annette's marijuana use substantially impaired her ability to parent, though it found that OCS had not met its burden with respect to proving

---

[12] *See* AS 47.10.011(9).

methamphetamine use;[13] and that Annette suffered from mental health issues that would put Justin at substantial risk of physical harm and mental injury in her custody.[14] The court also found by clear and convincing evidence that Annette had not remedied the conduct or conditions making Justin a child in need of aid within a reasonable time, because the case had been pending for nearly two years. The court found that it was in Justin's best interests to terminate Annette's parental rights so his foster family could proceed with adoption. The court issued its written order terminating Annette's parental rights in November.

Annette appeals, challenging both the finding that Justin was a child in need of aid and the finding that OCS made reasonable efforts.

## III. STANDARD OF REVIEW

"In a case involving the termination of parental rights, we review a superior court's findings of fact for clear error."[15] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[16] "[W]e will not reweigh evidence when the record provides clear support for the trial court's ruling."[17] We review for clear error the factual question of "[w]hether

---

[13]    *See* AS 47.10.011(10).

[14]    *See* AS 47.10.011(11).

[15]    *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 348 (Alaska 2016) (quoting *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1019 (Alaska 2012)).

[16]    *Claudio P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 860, 863 (Alaska 2013) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[17]    *Id.* (quoting *Sherman B.*, 290 P.3d at 428).

a child is a child in need of aid."[18] "Whether factual findings satisfy the requirements of the applicable [CINA] statute is a question of law that we review de novo."[19] "Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[20]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err When It Found By Clear And Convincing Evidence That Justin Was A Child In Need Of Aid.

In a termination of parental rights case, OCS must prove by clear and convincing evidence:  that the child is in need of aid under AS 47.10.011; that the parent has failed to remedy the conduct or conditions placing the child at risk of harm; and that OCS has made reasonable efforts to provide family services designed to enable reunification.[21]  OCS must also prove by a preponderance of the evidence that termination of parental rights is in the child's best interests.[22]

Alaska Statute 47.10.011(9) provides that a court may find a child to be a child in need of aid if "conduct by or conditions created by the parent, guardian, or custodian have subjected the child or another child in the same household to neglect."[23] Neglect is defined as "fail[ure] to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development, though financially able to do so or offered financial

---

[18]  *Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 353 P.3d 831, 837 (Alaska 2015).

[19]  *Id.*

[20]  *Sherman B.*, 290 P.3d at 428.

[21]  AS 47.10.088(a); CINA Rule 18(c)(1)-(2).

[22]  CINA Rule 18(c)(3).

[23]  AS 47.10.011(9).

or other reasonable means to do so."[24]

Annette argues that OCS failed to prove by clear and convincing evidence that Justin was in need of aid on any of the three grounds alleged in its petition because it did not establish a causal relationship between her conduct or mental health issues and Justin's exposure to drugs.[25] We need not consider each of the grounds alleged if we determine that the record supports any one of the superior court's child in need of aid findings; we may affirm that finding without considering the other grounds.[26]

Annette contends the court erred by finding that her conduct subjected Justin to neglect because OCS "never established how the methamphetamine [documented by the hair follicle test] got into Justin's system." She argues that the court "overlook[ed] the fact that the statute requires [OCS] to prove that the child was subject to neglect *as a result of parental conduct*." (Emphasis added.) OCS responds that it is not required to prove that Annette "actively created a drug-filled environment." Rather, it argues, the court was correct to find that Annette neglected Justin by failing to protect him from exposure to marijuana and methamphetamine by people she allowed to stay in her home.

---

[24] AS 47.10.014.

[25] In addition to subsection (9) of AS 47.10.011, OCS alleged that Justin was a child in need of aid under subsections (10) and (11), which provide that a child is in need of aid if "(10) the parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant" resulting in "a substantial risk of harm to the child," or if "(11) the parent . . . has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury." AS 47.10.011(10)-(11).

[26] *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 169 (Alaska 2015).

The record supports a finding by clear and convincing evidence that Annette neglected Justin by allowing him to be exposed to marijuana and methamphetamine. It is true that the only evidence of methamphetamine use by anyone close to Justin is the positive hair follicle test. Neither Annette nor Matthew was observed using, admitted to using, or tested positive for methamphetamine; their oral test results were negative; and, aside from a bag of marijuana, no drug paraphernalia was ever found in their home. However, as the court noted, there was no suggestion that Justin had been exposed to methamphetamine "anywhere else at daycare or anything like that."[27] No evidence at the termination trial indicated that Justin had spent time in someone else's care or had been exposed to drugs somewhere other than in Annette's home.[28]

Given this, it was not clearly erroneous for the court to infer, based on the positive hair follicle test, that Justin had been exposed to methamphetamine while under Annette and Matthew's care and that conditions they created in their home had led to his exposure. Nor was it error for the court to determine that, absent any indication that the drug exposure could have occurred outside Annette's home, the follicle test constituted

_____

[27]    While the court made this finding in the context of its oral findings on parental substance abuse rather than neglect, this finding also underlies the court's inference that Justin was exposed to drugs in Annette's home, and that Annette's decision to allow drug users to stay in her home amounted to neglect.

[28]    Annette and Matthew themselves speculated during the adjudication hearing that one or more visitors to their home may have exposed Justin to methamphetamine. The parties agreed that the court could consider this evidence at the termination trial. *See Carla W. v. State, Office of Children's Servs.*, 2008 WL 5352295 *5 (Alaska Dec. 24, 2008 (unpublished)).

clear and convincing evidence of neglect, even if the specific mechanism of that exposure could not be determined based on the available evidence.

Because we affirm the superior court's finding that Justin was a child in need of aid based on neglect, we need not review the court's findings regarding parental substance abuse and mental illness.[29] However, we remind superior courts that findings must be sufficient to support meaningful appellate review.[30] In this case the superior court's written findings stated only that "[t]he child, who is under [18] years of age, was shown by clear and convincing evidence to be a child in need of aid pursuant to AS 47.10.011(9), (10), and (11)." It is only because the court's oral findings made reference to specific facts and evidence presented at the termination trial that we are able to review its child in need of aid determination at all.[31] We reiterate that trial courts must make specific findings; where the written findings are largely conclusory, as here, the

---

[29]    *See Payton S.*, 349 P.3d at 169.

[30]    *See, e.g.*, *In re Adoption of Hannah L.*, 390 P.3d 1153, 1157 n.16 (Alaska 2017) ("[T]he superior court must provide findings sufficient to give a clear understanding of the grounds upon which it reached its decision." (quoting *Price v. Eastham*, 128 P.3d 725, 727 (Alaska 2006))); *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139 (Alaska 1997) ("A trial court's factual findings . . . must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved.").

[31]    Although we conclude that the court's findings on neglect are sufficient to permit appellate review and affirm on that basis, we note that its findings on parental mental illness under subsection (11) of AS 47.10.011 appear inadequate. The court observed that Annette had an "outburst" and struggled "to control herself" during the trial; based on this the court "acknowledged that she ha[s] mental health issues," but it made no connection to any potential harm to Justin as a result. The court stated that "there was clear and convincing evidence presented that [Annette] does have a mental illness" and that OCS had proven "both harm and mental injury . . . with respect to [Justin] remaining in [Annette]'s custody or care," but it pointed to no specific facts that would support either finding.

court must make oral findings that are sufficiently detailed to explain the basis for the court's decision and to enable meaningful review.

B.    **The Superior Court Did Not Err When It Determined That OCS Made Reasonable Efforts To Reunify The Family.**

Alaska Statute 47.10.086(a) requires OCS to "make timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home."  The statute requires OCS to:

> (1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;
>
> (2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; [OCS] shall refer the parent or guardian to, and distribute to the parent or guardian information on, community-based family support services whenever community-based services are available and desired by the parent or guardian . . . ;
>
> (3) document [OCS]'s actions that are taken under (1) and (2) of this subsection.[32]

The superior court must find by clear and convincing evidence that OCS has made the required reasonable efforts before it can order termination of parental rights.[33]

Annette argues that OCS's efforts "failed to address the needs of the family because OCS did not accommodate [her] anxiety issues."  She concedes that her first caseworker "tried to provide her with a stress free environment," but asserts that "later caseworkers did not accommodate [her] anxiety."  She argues that, because OCS must

---

[32]    AS 47.10.086(a)(1)-(3).

[33]    AS 47.10.088(a)(3).

tailor its efforts to the circumstances of her case[34] and because OCS was aware of her mental health issues, efforts that "may have been sufficient for someone without an anxiety disorder . . . fell far short of what was needed in the present case." She suggests that OCS should have consulted a mental health expert to determine how best to engage with her "on her terms." OCS responds that the record supports a finding that caseworkers took specific steps to accommodate and mitigate Annette's anxiety. OCS blames Annette's lack of engagement for its failed efforts and emphasizes that, because OCS has some discretion to decide what efforts to pursue, it was not required to consult a mental health expert in this case. OCS further argues that because Annette refused to complete a mental health assessment, a mental health expert would have been unable to identify Annette's needs or how to address them.

We have held that "OCS's efforts must be 'reasonable but need not be perfect' "[35] and must be assessed "in light of the circumstances" of the case, which "can include a parent's unwillingness to participate in treatment."[36] In determining the reasonableness of OCS's efforts, we may consider "all interactions between the parent and OCS" as well as "the entire history of services" OCS has provided.[37] "Our case law

---

[34]     *See Shirley M. v. State, Dep't of Heath & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1242 (Alaska 2015) ("OCS is . . . required to take into account the parent's limitations or disabilities and make any reasonable accommodations.").

[35]     *Violet C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1032, 1038 (Alaska 2019) (quoting *Audrey H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008)).

[36]     *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013).

[37]     *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 n.21 (Alaska 2015) (first quoting *Audrey H.*, 188 P.3d at 679 n.35; (continued...)

and the internal policies of OCS suggest that family reunification services should be provided in a manner that takes a parent's disability into account."[38] OCS's duty to "offer reunification services is fulfilled by setting out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services."[39] OCS's obligation does not extend to forcing an uncooperative or unwilling parent to engage in services, including mental health treatment.[40]

Here the superior court found that OCS caseworkers had "gone over and above . . . to try and get [Annette] to engage in treatment," contacting her frequently by multiple means of communication and finding options for walk-in appointments after determining that her mental health issues would make attending pre-scheduled appointments difficult. The court also noted that Annette did consistently attend visits with Justin, which the court took as evidence that "she is able to get where she needs to go when she wants to" and that it was not her mental illness but her unwillingness to

---

[37]    (...continued) then quoting *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003)).

[38]    *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1115-16 (Alaska 2010); *see* ALASKA OFFICE OF CHILDREN'S SERVICES, CHILD PROTECTIVE SERVICES MANUAL § 6.1.14(c) (2019), http://dhss.alaska.gov/ocs/Documents/Publications/ CPSManual/cps-manual.pdf ("The Division shall operate each of its services, programs, and activities so that a service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.").

[39]    *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 851 (Alaska 2014) (quoting *Audrey H.*, 188 P.3d at 679).

[40]    *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 857 (Alaska 2013) (holding that OCS was not required to obtain court order requiring parent to participate in mental health services to satisfy Indian Child Welfare Act's active efforts requirement, *see* 25 U.S.C. § 1912(d) (2012)).

engage that prevented her from getting substance abuse and mental health assessments.[41]

The record provides ample support for the court's findings. Although Annette's three caseworkers experienced varying levels of success getting her to engage, they all made efforts to accommodate her. They testified that they worked with Annette to identify walk-in services because she struggled with attending appointments made far in advance. The initial caseworker also offered to accompany Annette to a meeting with a substance abuse treatment provider when Annette refused to go without Matthew. And when Annette expressed discomfort with the providers to whom OCS had initially referred her, the third caseworker made new referrals and attempted to make sure she was comfortable with following up on them. He also gave Annette and Matthew a variety of options for completing the parenting classes Annette's case plan required, including using a booklet at home or taking classes online or in person. And caseworkers allowed Matthew to participate with Annette, acknowledging the "supportive role" he played in mitigating Annette's anxiety. They also tried to engage with Annette alone when Matthew's influence appeared counterproductive.

The record also contains ample evidence of Annette's lack of engagement. She completed neither a substance abuse nor a mental health assessment. She and Matthew repeatedly cut short meetings with caseworkers or failed to attend them altogether, and Annette would "walk out" when the second caseworker tried to speak with her after her scheduled visits with Justin. Because she refused to get assessments, OCS was unable to determine the extent of her mental health or substance abuse needs

---

[41] *See Lucy J.*, 244 P.3d at 1117 (rejecting mother's argument that OCS failed to accommodate her disabilities in part based on evidence supporting trial court's finding that she was "capable of and has initiated programs when she want[ed] to").

or how best to assist her.[42]

The court therefore did not err when it found by clear and convincing evidence that OCS had made reasonable efforts to reunify the family, taking Annette's mental health issues into account. We affirm the superior court's reasonable efforts finding.

## V.    CONCLUSION

Because the record adequately supports the superior court's finding that Justin was a child in need of aid based upon neglect, and because OCS made reasonable efforts to accommodate Annette's mental health issues as it worked to connect her with services, we AFFIRM the termination of Annette's parental rights.

---

[42]    *See Audrey H.*, 188 P.3d at 681 (affirming reasonable efforts finding in part based on parent's unwillingness to participate in evaluations that might have allowed OCS "to identify additional services catered to her specific needs").

THE SUPREME COURT OF THE STATE OF ALASKA

ANNETTE H.,                                )
                                           )  Supreme Court No. S-17290
                Appellant,                 )
                                           )        **ORDER**
        v.                                 )  Withdraw and Reissue Opinion
                                           )
STATE OF ALASKA, DEPARTMENT                )
OF HEALTH & SOCIAL SERVICES,               )
OFFICE OF CHILDREN'S SERVICES,             )  Date of Order – October 11, 2019
                                           )
                Appellee.                  )
                                           )
_____    )

        Before:  Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

        Having considered the State's petition for rehearing and the appellant's response,

        **IT IS ORDERED**:

        1.      The Petition for Rehearing is **GRANTED**.

        2.      Opinion No. 7403 issued on August 30, 2019, is **WITHDRAWN** and
Opinion No. 7414 is issued on October 11, 2019, in its place.   The revised opinion
incorporates the following changes to footnote 28.

        Annette and Matthew themselves speculated during the adjudication
hearing that one or more visitors to their home may have exposed Justin to
methamphetamine.  The parties agreed that the court could consider this evidence at the
termination trial.  *See Carla W. v. State, Office of Children's Servs.*, 2008 WL 5352295
*5 (Alaska Dec. 24, 2008 (unpublished)).

        Entered by direction of the court.

                                           Clerk of the Appellate Courts


                                           /s/

                                           _____
                                           Meredith Montgomery

Annette H. v. State of Alaska, DHSS, OCS
Supreme Court No. S-17290
Order of October 11, 2019
Page Two


cc:    Supreme Court Justices
       Judge Andrew Peterson
       Trial Court Appeals Clerk
       Publishers

Distribution:

       J. Adam Bartlett
       The Law Office Of J. Adam Bartlett, LLC
       1101 W 7th Ave
       Anchorage, AK 99501-2157

       Laura Wolff
       Assistant Attorney General
       1031 W. 4th Ave, Suite 200
       Anchorage, AK 99501

       Gena O'Neal
       Alaska Advocacy, LLC
       Box 210986
       Anchorage, AK 99521