NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ANNA S., | ) |
| | ) Supreme Court No. S-18152 |
| Appellant, | ) |
| | ) Superior Court No. 3PA-19-00174/ |
| v. | ) 00175/00176 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) MEMORANDUM OPINION |
| OFFICE OF CHILDREN'S SERVICES, | ) AND JUDGMENT* |
| | ) |
| Appellee. | ) No. 1918 – August 31, 2022 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

Appearances: Megan M. Rowe, Alaska Legal Drafting, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

I.     **INTRODUCTION**

At the conclusion of a termination trial, the superior court found by clear and convincing evidence that three children were in need of aid because of their mother's substance abuse. The court also found by clear and convincing evidence that the Office of Children's Services (OCS) had made reasonable efforts to reunify the mother with her

---

\*      Entered under Alaska Appellate Rule 214.

children. And the court found that the mother had failed to remedy her conduct because, although she made some progress in the months immediately before trial, she had refused to work with OCS for the first fourteen months her children were in custody. The court terminated the mother's parental rights. The mother appeals and we affirm the termination.

## II. BACKGROUND

### A. Removal And Emergency Petition

Anna S.[1] is the mother of five children. Her three minor children are the subject of this appeal.[2]

In October 2019 OCS responded to a report that Anna was neglecting her children due to her substance abuse. Anna was having visual hallucinations when the caseworker arrived at her home. Anna told the caseworker that "little people were running around the house," that "people could sexually abuse her children through the television," and that there were letters in her son's stool which she had collected in a bag and put by the door. Anna agreed to a drug test which was positive for methamphetamine, amphetamine, and opiates. The caseworker attempted to create a safety plan with Anna, but Anna was not capable of doing so at that time. While the caseworker was at the home, police officers arrived to conduct a welfare check. They had to use flashlights to see inside because most of the lights did not work. After Anna's step-father arrived to pick up the children, the police took Anna to the local emergency

---

[1] We use pseudonyms to protect the family's privacy.

[2] The children's fathers' parental rights were terminated in April 2021 and they do not participate in this appeal.

room.[3]

The following day OCS filed a petition for emergency custody of the three children.[4] The petition alleged that the children were in need of aid due to abandonment, physical harm, neglect, parental substance abuse, and parental mental illness.[5] In an emergency hearing the superior court found probable cause that the children were in need of aid based on each of the five allegations in the petition and awarded OCS temporary custody.

## B.    OCS's Efforts To Reunify Anna With Her Children

The assigned caseworker notified Anna by text about the initial emergency hearing and asked her to call the OCS office. Anna responded with an expletive and did not attend the hearing. Shortly after the hearing, the caseworker made referrals for urinalysis (UA) and family visitation. The caseworker informed Anna she could begin UAs and visitation once she contacted the caseworker. The caseworker contacted Anna again the following month to try to arrange visits with the children. Anna missed the visits that were scheduled in November and December.

In January 2020 another caseworker was assigned. In an attempt to better accommodate Anna's schedule, the caseworker set up a new visitation schedule and sent a new referral for visitation. The caseworker also tried to arrange an in-person meeting

---

[3]    The children remained with their grandparents throughout the CINA proceedings.

[4]    *See* AS 47.10.142 (governing emergency custody); CINA Rule 6 (same).

[5]    *See* AS 47.10.011 (providing that child may be in need of aid if (1) parent has abandoned child; (6) child has suffered substantial physical harm as a result of conduct by or conditions created by parent; (9) parent has neglected child; (10) parent has been substantially impaired due to use of an intoxicant; or (11) parent has mental illness which has placed child at risk of harm).

with Anna, but Anna neither responded to the caseworker nor attended the meeting. The caseworker then emailed Anna's attorney to attempt to contact Anna. The caseworker made further attempts to contact Anna in January and February, but to no avail.

The caseworker made a case plan for Anna in February. The case plan listed three goals: to live a safe and sober lifestyle; to become a safe parent capable of meeting the physical, emotional, and developmental needs of her children; and to build and maintain a relationship with her children that would help them process their past trauma. The plan also outlined specific steps to help Anna achieve those goals, including signing releases of information with her providers, participating in an integrated substance abuse and mental health assessment and a domestic violence assessment, attending UA appointments and visits, and enrolling in a parental education course and a childhood development course.

The caseworker was finally able to contact Anna in March and held a case planning meeting. The caseworker gave Anna a copy of her case plan, a services resources guide, a calendar, and contact information for services. Anna told the caseworker that her car was not running. She denied using illegal drugs and told the caseworker that the incident described in the emergency petition did not happen. Following the meeting, Anna attended a scheduled hearing and stipulated that her children were in need of aid without admitting any facts. About a week after the meeting, the caseworker provided Anna with five hundred dollars worth of cab fare vouchers to enable her to attend UAs, visits, and other case-related activities.

A third caseworker was assigned in May 2020. That caseworker tried repeatedly to contact Anna by text message and phone call. He met Anna at her home and provided her with another copy of the case plan. He asked Anna whether there were problems that were keeping her from working on her case plan, and provided her with bus passes as an alternative to the cab vouchers. He stressed that her case plan required

her to have a mental health and substance abuse assessment and encouraged her to schedule one.

The case worker contacted Anna again the following month to try to set up another in-person meeting. By then Anna had not provided any UAs in March, April, or May and had missed most of the scheduled visits with her children. The caseworker explained the OCS policy to cancel UAs or visits if a parent missed four in a row, and warned Anna that if she continued on her current path UAs and visits would be cancelled.

The caseworker continued to attempt to reach Anna throughout the summer. He met with her in person in early July. He gave her the case plan, encouraged her to "start with three things that she can accomplish" and to tell him if there was anything he could do to help arrange visits. Since the children's grandparents lived over an hour away, and Anna was often late or did not attend family visits, OCS implemented a policy requiring her to show up an hour before the children were scheduled to arrive. OCS explained the policy was also designed to minimize the emotional trauma the missed visits caused Anna's children. Because Anna was not able to comply with the policy, visitation was suspended in August. The caseworker notified Anna about the suspension of visits and later about an upcoming court date.

In October Anna was arrested for driving under the influence and drug possession. Following her release from jail, Anna sent the caseworker long text messages, but did not answer her phone when he tried to call her. The caseworker continued to try to reach her by text and phone calls to encourage her to work on her case plan. He also informed her by phone of court dates.

OCS filed a permanency report in October, changing the goal for the children from reunification with Anna to adoption by their grandparents. At a permanency hearing, the court found that the children remained in need of aid, that

OCS's recommendation of adoption was an appropriate permanency plan, and that OCS had made reasonable efforts. Anna opposed the children's adoption and reserved the right to contest the court's permanency findings at a termination trial.

In December 2020 she tested positive for several illegal substances. Anna completed a substance abuse and mental health assessment. She met with the caseworker a few days later, and provided him the assessor's recommendations for a psychological evaluation, group therapy, and parenting and relapse prevention classes. The assessor had also diagnosed Anna with opioid dependence and recommended that she participate in intensive outpatient substance abuse treatment. Anna began attending classes at her church.[6] Anna also continued to maintain that the incident that led to OCS's custody of the children never occurred and that she had not taken prescription or illegal substances. When the caseworker asked about her October DUI and positive UA, Anna stated that she had used substances for a two-month period right before that event but never used them again. Later in December Anna tested positive for oxycodone.

By January 2021 Anna moved in with a friend and began attending counseling arranged by OCS. She kept some of her UA appointments — one UA was positive for oxycodone, two were negative, and she missed two. She continued attending church and classes arranged by the church. She also began attending outpatient substance abuse treatment. The caseworker was able to stay in contact with Anna during the following three months.

In March 2021 Anna asked if she could begin a trial home visit with the children because she was about to complete her outpatient treatment. The caseworker explained she had not made enough progress in her case plan and explained additional

---

[6] It is unclear whether OCS approved the classes, although the assigned caseworker testified that he was aware Anna was attending them.

steps she needed to complete, including being honest about her past substance abuse. In April they had a similar discussion. The caseworker also continued to encourage Anna to complete the psychological evaluation, but she did not.

### C.    Termination Trial

In October 2020 OCS petitioned to terminate Anna's and the fathers' parental rights. At the start of the termination trial in February 2021, Anna's attorney told the court that Anna intended to sign a relinquishment. The court scheduled an appointment later that day at the OCS office for Anna to sign the relinquishment form and set a status hearing in March to confirm its receipt of the relinquishment. The court excused Anna's witnesses but continued to take evidence from OCS.

The first caseworker testified about the October 2019 incident that prompted the emergency petition for adjudication and custody. She stated that she had to remove the children because Anna was hallucinating and obviously under the influence of something, which was confirmed by the drug test Anna agreed to take. She testified that Anna's seventeen-year-old daughter reported taking care of the younger children because Anna was unable to. The caseworker also testified about making referrals for UAs and visits for Anna after taking custody of the children.

OCS called Anna as a witness. She described her experience with her children's fathers and testified that she had never used methamphetamine or heroin until six months before OCS took custody of the children. After being shown evidence of earlier use, she acknowledged that she had used opiates as early as 2013. And she denied having hallucinations or making any unusual comments to the caseworker who came to her home in October 2019. After OCS rested its case the superior court terminated the fathers' parental rights.

At the status hearing in March, Anna's attorney informed the court that Anna had decided not to relinquish her parental rights. The court scheduled the

termination trial to resume in April.

When trial resumed, the current caseworker testified regarding OCS's reunification efforts and whether Anna had remedied her conduct within a reasonable period of time. He described the case plan, referrals to mental health and substance abuse assessments, arranging UAs and visits, providing cab vouchers and bus passes, and consistent attempts to reach Anna by a variety of means including meeting at her home. He also testified that the children were doing well at their grandparents' home — they felt safe and were doing well in school.

The caseworker testified that Anna had not been sober long enough to meet her case plan goals. He also stated that Anna was evasive and untruthful about her drug use and failed to take responsibility for placing her children in danger. He testified that Anna had attended only 18 of 136 scheduled UAs, and most of the UAs she had attended had been in the preceding four months. Additionally, she had gone to only 14 of 56 visits scheduled with her children. He relayed that Anna's counselor reported Anna "still ha[d] a long way to go" to achieve sobriety and that Anna's two older daughters had estimated that Anna had used substances for at least 13 to 15 years.[7] And he testified that Anna refused to obtain a psychological evaluation despite encouragement from both the caseworker and her counselor.

A teacher of classes Anna attended through her church testified as a witness for Anna. She stated that one class was designed to help victims of domestic abuse find relief from abuse and learn self worth and another class encouraged positive self-talk; the teacher did not know if OCS approved of the classes. She testified that Anna diligently attended classes, seemed to be honest in group discussions, and had appeared "more

---

[7] The court admitted this evidence for the limited purpose of establishing why the caseworker had concluded that Anna had not achieved her case plan goals.

confident" as a result of the classes. The teacher acknowledged she was not a licensed social worker or therapist and did not have an advanced degree. She testified that she was not aware that Anna struggled with any particular issues, but had heard that Anna could "never let her husband back in her life."

Anna's roommate testified that Anna moved in with her in January 2021 and had appeared to be sober since that time. She testified she first met Anna a month before she moved in and that Anna had been open with her about her prior methamphetamine use, but they did not discuss it often or in detail.

Anna testified that she had been sober since she last used alcohol in November 2020. However, when asked directly by the court, Anna admitted that she had also used controlled substances that same month. She stated she understood that her drug use was part of the reason that OCS had assumed custody of her children and that she took responsibility for using drugs and endangering the children. She described having "a plan for sobriety" and testified she was taking a medication to treat opioid addiction to stay sober. She testified that she wanted to remain sober and have her children returned.

On cross-examination Anna testified that she did not get a psychological evaluation because she was "getting a lot accomplished" and "jumping through more hoops [did not] sound extremely exciting." Anna was unsure about when she started abusing prescription medication but she "d[id]n't disagree" with her older daughters' statements that it had been as long as 15 years before. She also asserted that she had "been sober for years at a time."

The superior court put its decision on the record. It found the children in

need of aid due to Anna's substance abuse.[8]  The court found that OCS had made reasonable efforts to reunify Anna with the children by making case plans and referrals, following up with her providers, arranging family visits, and providing Anna with cab vouchers and bus passes.  It observed that Anna was often unresponsive to OCS's attempts to contact her through text messages, phone calls, and visits to her home.  The court found that although Anna had "recently . . . engaged in her case plan activities" she had failed to remedy the conduct that placed her children in need of aid because she had not made any real effort for more than a year after they were removed from her care and failed to acknowledge the extent of her substance abuse.  The court then pointed to Anna's testimony that she had been sober since November 2020, despite her positive UA results in November 2020, December 2020, and January 2021.  It characterized Anna's testimony about her substance use as "evasive" and "not at all credible" and concluded that Anna had "minimize[d]" the abuse and neglect her children had suffered.  Lastly, the court found that it was in the children's best interests to terminate Anna's parental rights.

The court subsequently issued a written order terminating Anna's parental rights.  Anna appeals.

## III.  STANDARD OF REVIEW

"In a CINA termination proceeding we review a superior court's factual findings for clear error."[9]  Factual "[f]indings are clearly erroneous if review of the entire

---

**8**    AS 47.10.011(10) (providing child may be found in need of aid if parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant" that "has resulted in a substantial risk of harm to the child").

**9**    *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273 (Alaska 2014).

record leaves us with 'a definite and firm conviction that a mistake has been made.' "[10] "Conflicting evidence is generally insufficient to overturn the trial court, and we will not reweigh evidence when the record provides clear support for the trial court's ruling."[11] "[W]hether the parent failed to remedy the 'conduct or the conditions that placed the child at substantial risk' of harm are factual findings reviewed for clear error."[12]

"Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[13] "For mixed questions, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[14] "Whether factual findings satisfy the requirements of the applicable [CINA] statute is a question of law that we review de novo."[15]

## IV.   DISCUSSION

Alaska Statute 47.10.088 requires the superior court to make three findings by clear and convincing evidence before terminating parental rights:  (1) a child is in need of aid under AS 47.10.011; (2) the parent has not, within a reasonable time,

---

[10]    *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 265 (Alaska 2019) (quoting *Claudio P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 860, 863 (Alaska 2013)).

[11]    *Claudio P.*, 309 P.3d at 863.

[12]    *Sherry R.*, 332 P.3d at 1273 (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 428 (Alaska 2012)).

[13]    *Annette H.*, 450 P.3d at 265 (quoting *Sherman B.*, 290 P.3d at 428).

[14]    *Violet C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1032, 1037 (Alaska 2019) (quoting *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448 (Alaska 2017)).

[15]    *Annette H.*, 450 P.3d at 265 (alteration in original) (quoting *Theresa L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 353 P.3d 831, 837 (Alaska 2015)).

remedied the conduct or conditions in the home to enable the safe return of the child; and (3) OCS has made reasonable efforts to reunify the family.[16] The court must also find "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[17]

Anna does not challenge the superior court's findings that her children were in need of aid and that termination was in their best interests. She challenges the findings that she failed to remedy the conduct that caused her children to be in need of aid and that OCS made reasonable efforts.

### A.    Anna Failed To Remedy Her Conduct In A Reasonable Period Of Time.

The record supports the court's finding that Anna did not remedy her conduct or the conditions that caused her children to be in need of aid in a reasonable period of time. "In order to terminate parental rights, the superior court must find by clear and convincing evidence that the parent has failed, within a reasonable time, to remedy the conduct that placed the child at substantial risk of harm."[18] "In making a determination . . . the court may consider any fact relating to the best interests of the child . . . ."[19] "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[20] And even when a parent has made progress

---

[16]    AS 47.10.088(a).

[17]    CINA Rule 18(c)(3); AS 47.10.088(c).

[18]    *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1274 (Alaska 2014) (citing AS 47.10.088(a)).

[19]    AS 47.10.088(b).

[20]    *Sherry R.*, 332 P.3d at 1274 (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003)).

towards becoming sober, the superior court can consider the parent's history of substance abuse and whether the sobriety is "very new."[21]

The superior court specifically found that Anna was not credible when she claimed to have been sober since November 2020. And it concluded that she had failed to remedy her substance abuse that caused the children to be in need of aid. The court cited Anna's positive UA results from November 2020 through January 2021 as evidence that she had not remedied her addiction. The court also noted Anna's contradictory claims about her past drug use. The court found that her refusal to obtain a psychological evaluation, her 14-month delay before beginning to work with OCS on her case plan, and her many missed UAs and visits with the children proved that she had not made necessary changes. And when it concluded that termination of Anna's parental rights was in the children's best interests, the court concluded that Anna was unlikely to be able to remedy her substance abuse for a very long time, if ever, and that returning the children to her would place them at substantial risk of harm.

Anna argues that it was clear error to find that her efforts to remedy her substance abuse were "insufficient" and that the court erred by finding that she was not credible. She asserts that the record reflected she had acknowledged and taken responsibility for her substance abuse endangering her children. But judging a witness's

---

[21]    *See Sherry R.*, 74 P.3d at 903 (affirming trial court's reliance on mother's long history of substance abuse in making termination decision despite recent progress towards sobriety); *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1112-13 (Alaska 2010) (affirming superior court's failure-to-remedy finding because nine-month period of sobriety following years of alcohol abuse was insufficient to demonstrate timely remedying of conduct); *Christopher C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 465, 475-76 (Alaska 2013) (affirming superior court's determination that four and one-half months of sobriety outside of residential treatment was insufficient to establish timely remedy of addiction).

credibility is the province of the trial court,[22] and even if some evidence supports Anna's assertions, we do not reweigh the evidence when the trial court's findings are supported by the record.[23] The superior court did not err by finding that Anna was not credible and ultimately finding that she failed to remedy her conduct.

**B.     OCS Made Reasonable Efforts To Reunify Anna With Her Children.**

Alaska Statute 47.10.086(a) requires OCS to "make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child . . . to enable the safe return of the child to the family home." The statute requires OCS to:

> (1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;
>
> (2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to, and distribute to the parent or guardian information on, community-based family support services whenever community-based services are available and desired by the parent or guardian; the information may include the use of a power of attorney under AS 13.26.066 to select an individual to care for the child temporarily; and
>
> (3) document the department's actions that are taken under (1) and (2) of this subsection.[24]

---

[22]     *Tessa M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) ("[I]t is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence.").

[23]     *See Claudio P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 860, 863 (Alaska 2013).

[24]     AS 47.10.086(a).

Anna does not challenge the court's factual findings about the specific services she was offered, but disputes the finding that OCS's efforts were reasonable. She argues that, in light of her mental health issues, it was unreasonable for OCS to arrange UAs and visits immediately after assuming emergency custody of her children. OCS responds that it is required to make "*timely*, reasonable efforts"[25] and to ensure that Anna was able to exercise her "right and responsibility of reasonable visitation."[26] OCS also notes that Anna's early stumbles would not have prevented her from participating in services later, and points out that it continued to try to get her to participate in services even after visits were cancelled.

"In considering the reasonableness of [OCS]'s efforts, '[w]e have acknowledged that [OCS] has some discretion both in determining what efforts to pursue and when to pursue them.' "[27] " 'OCS's efforts must be "reasonable but need not be perfect" ' and must be assessed 'in light of the circumstances' of the case, which 'can include a parent's unwillingness to participate in treatment.' "[28] Additionally, "[o]ur case law and the internal policies of OCS suggest that family reunification services should be

---

[25] AS 47.10.086(a) (emphasis added).

[26] AS 47.10.084(c) (stating residual rights of parent once legal custody has been transferred to guardian).

[27] *Emma D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 850 (Alaska 2014) (second alteration in original) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 432 (Alaska 2012)).

[28] *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 267-68 (Alaska 2019) (footnote omitted) (first quoting *Violet C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1032, 1038 (Alaska 2019); then quoting *Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 259 (Alaska 2013)).

provided in a manner that takes a parent's disability into account."[29]

The superior court concluded that OCS made reasonable efforts based on its "ongoing attempts to engage [Anna] in her case plan and in case planning activities from the beginning of this case through" to the end of trial. It highlighted OCS's "significant," though often unsuccessful, attempts to reach Anna by text, phone call, and home visits. The court underscored the many referrals OCS made to help Anna meet her case plan goals, including arranging visits and UAs, providing transportation vouchers, making referrals to various assessments, and following up with her providers to pursue further recommended treatment.

In *Annette M. v. State, Department of Health & Social Services, Office of Children's Services*, the mother claimed that the superior court erred by finding reasonable efforts because OCS had "not accommodate[d her] anxiety issues."[30] She argued that since OCS was aware of her mental health issues, it should have "consulted a mental health expert to determine how best to engage with her 'on her terms.' "[31] We affirmed the superior court's finding of reasonable efforts, noting that the record showed OCS had identified various and alternative treatments to meet her needs, but the mother never completed a substance abuse or mental health assessment.[32] And because the mother "refused to get assessments, OCS was unable to determine the extent of her

---

[29] *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1115 (Alaska 2010).

[30] 450 P.3d at 267.

[31] *Id.*

[32] *Id.* at 268-69.

mental health or substance abuse needs or how best to assist her."[33]

Here, as in *Annette M.*, OCS referred Anna to a dual substance abuse and mental health assessment, but Anna refused to participate for over a year after her children were removed. And when Anna eventually completed the assessment, it recommended that she undergo a psychological evaluation. OCS continuously encouraged Anna to complete the evaluation, which the OCS caseworker thought would help "identify medications" or "treatment classes," but Anna refused to do so, stating that she did not wish to continue "jumping through more hoops."

OCS scheduled visits for Anna from November 2019 through August 2020, even though Anna frequently missed the visits. Only after she missed four in a row did OCS cancel the visits, as it had warned Anna it would do, after explaining that her children had been "traumatiz[ed]" by the visits she missed. Anna resumed supervised family visits before the termination trial, but OCS denied Anna's request to have trial home visits.

Anna contrasts her case with that of *Warren S. v. State, Department of Health & Social Services, Office of Children's Services.*[34] In *Warren S.*, the father argued that it was not reasonable for OCS to require him to complete a substance abuse assessment and testing without first addressing his mental health needs.[35] The only evidence presented that the father had mental health needs was his testimony that he did

---

[33]     *Id.* at 269; *see also Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 681 (Alaska 2008) (affirming reasonable efforts finding in part based on parent's unwillingness to participate in evaluations that might have allowed OCS "to identify additional services catered to her specific needs").

[34]     No. S-17942, 2021 WL 3754600 (Aug. 25, 2021).

[35]     *Id.* at *4.

not work with OCS due to his "severe anxiety."[36] But there was no evidence that he had told OCS about his anxiety or that OCS had asked him to obtain a mental health assessment; and there was testimony that he refused to work with OCS because of his substance abuse.[37] We therefore affirmed the superior court's finding that OCS had made reasonable efforts.[38]

Anna distinguishes her case from *Warren S.* by asserting that her substance abuse *itself* and the mental health issues she developed as a result left her unable to work with OCS. She also argues that, unlike in *Warren S.*, OCS knew about her mental health issues, and did not take them into account. But Anna refused for over a year to obtain the substance abuse and mental health assessments that OCS requested which would have allowed OCS to "to identify additional services catered to her specific needs," and she never completed the recommended psychological evaluation.[39] Because Anna did not complete the assessments, OCS was unable to obtain the information they would have provided about her mental health needs. Because there is no evidence that Anna suffered from mental health issues or that OCS knew of them, the superior court did not err by finding that OCS made reasonable efforts to reunify Anna with her children.

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Anna's parental rights.

---

[36]    *Id.* at *2.

[37]    *Id.* at *4.

[38]    *Id.*

[39]    *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 681 (Alaska 2008).