NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DEX T., | ) | |
| | ) | Supreme Court No. S-18288 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-18-00005 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1924 – October 5, 2022 |
| and AMANDA T., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Thomas I. Temple, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Robert Kutchin, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee State of Alaska, Department of Health & Social Services, Office of Children's Services. Megan R. Webb, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellee Amanda T. Nikole V. Schick, Assistant Public Advocate, Fairbanks, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

---

\*     Entered under Alaska Appellate Rule 214.

# I. INTRODUCTION

The superior court terminated a father's parental rights after finding that he abandoned his child by failing to support or communicate with the child for over two years. The father appeals, arguing that the court's factual findings were erroneous and that his lack of contact with the child was the fault of the Office of Children's Services (OCS). He also argues that OCS failed to make reasonable efforts to reunite him with his child.

We affirm the superior court. Its factual findings are supported by the record. The father's frustration with the limited contact OCS was willing to allow as he reestablished a relationship with his daughter did not justify his failure to have any contact with her. And OCS's reunification efforts were reasonable in light of the father's unwillingness to pursue remedial services or stay in contact with the agency.

# II. FACTS AND PROCEEDINGS

## A. Facts

Dex T. and Amanda T. met and began a relationship in high school.[1] Dex began to physically abuse Amanda, eventually leading Amanda to obtain a short-term domestic violence protective order.

In March 2016 Dex and Amanda had a child together named Andie. A few months later Amanda took Andie to live with Dex in Arizona, where he was in school, but they returned to Alaska when Dex's abuse continued. Amanda sought another protective order against Dex.

Upon returning to Alaska Amanda began a relationship with another partner and took Andie to live with him in Fairbanks. This partner was also abusive, prompting

---

[1]     We use pseudonyms in this case to protect the parties' privacy.

OCS to file a petition to adjudicate Andie a child in need of aid in January 2018.[2]

B.    OCS Involvement

OCS was awarded legal custody of Andie in December 2017, and with Amanda's agreement, OCS placed Andie with Amanda's parents. OCS had difficulty contacting Dex; after two months of trying, OCS succeeded in contacting Dex in February 2018.[3] Dex expressed frustration that Amanda had his phone number but did not share it with OCS. He told the caseworker that he had had video contact with Andie until about two weeks earlier. OCS did not establish visitation between Dex and Andie at this time, but was exploring how to facilitate visitation through Amanda's parents, who expressed fear of Dex because he had previously threatened their lives.

A new caseworker was assigned at the beginning of April, and after an unsuccessful attempt to contact Dex she succeeded in reaching him in early May. He was living in Arizona and stated he did not intend to return to Alaska. He acknowledged having an unhealthy relationship with Amanda and engaging in domestic violence. The caseworker discussed his having contact with Andie and whether he wanted to send letters or gifts or have telephonic visits with her. The caseworker gave Dex her email and cell phone number, in addition to the main OCS number, so that he could stay in contact with her.

At a pair of hearings in May 2018, Dex participated telephonically. He declined appointment of counsel. The judge emphasized to Dex the importance of participating in his case to preserve his parental rights. Dex requested visitation and

---

[2]    It appears OCS had opened another case involving Andie in 2016, and had drafted an initial case plan for Dex in January 2017. The record does not provide many details about this case, and it was apparently closed.

[3]    Amanda later told OCS that Dex often changed his email address, phone number, and name on his social media accounts.

custody of his child. However, at the subsequent adjudication trial that month, he did not appear. OCS represented that Dex understood the child was safely with her grandparents. Based on OCS's offer of proof, the court found that Andie was a child in need of aid due to Dex's neglect.[4] Three days later Amanda stipulated that Andie was a child in need of aid and that it was in Andie's best interests to be in OCS custody.

OCS developed a case plan for Dex that focused on domestic violence. Dex's caseworker asked him to research support services himself, and she also researched services available in the Phoenix area. OCS repeatedly urged Dex to send Andie letters, gifts, or photos to begin building a bond, but he did not do so.

OCS's next contact with Dex was in the fall of 2018. Dex had directly called Amanda's parents and asked to have video contact with Andie. Amanda's parents expressed discomfort with facilitating visitation with Dex directly, telling OCS that he was often rude and angry; they did not believe Dex would be appropriate in communications with Andie. OCS offered to facilitate and supervise telephonic visitation between Dex and Andie with the goal of future video visitation directly through the grandparents. But Dex never followed up and instead fell out of contact with OCS for months, despite OCS leaving him monthly voice messages.

From October 2018 to June 2020, OCS was unable to reach Dex. OCS attempted to contact him monthly until April 2019. A new caseworker was assigned in August 2019 and tried to contact Dex, but the phone number OCS had on file for him was disconnected. The caseworker also tried social media searches to no avail. Dex finally contacted OCS in June 2020, explaining he had moved to Texas and had not

---

[4] *See* AS 47.10.011(9) ("[T]he court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to . . . conduct by or conditions created by the parent . . . [that] have subjected the child . . . to neglect.").

updated his contact information. He said he was in Anchorage for a short period to respond to criminal charges and wanted visitation with Andie. OCS could not offer visitation because of the short time frame. After Dex returned to Texas OCS repeatedly tried to contact him at the phone number he had used, but was unsuccessful.

OCS updated Dex's case plan in June 2020. The case plan required Dex to stay in contact with OCS, send letters and pictures to establish a relationship with Andie, and work with OCS to achieve permanency for Andie. The court held a review hearing that month to discuss guardianship by Amanda's parents.

OCS explained it was attempting to contact Dex "to get him on board with the guardianship or to terminate his rights through service and offer and proof." In response to a question about when the case would be ready for guardianship or a termination trial, OCS's attorney stated, "I think the answer to that question is we have to perfect the case on dad. . . . [W]e just cannot have a consent to guardianship without his consent, or we need to remove him from the picture." In October 2020 OCS filed a termination petition asserting that Dex had abandoned Andie.[5]

Dex contacted OCS in late December 2020 and began to communicate with the agency by email. He still declined to send photos or letters to Andie and said he did not need assistance accessing services and programs where he was living. In one email he criticized OCS in profane language and wrote in all capital letters, "I want to have my child in my care upon proving I[']m a fit father."

OCS continued to regularly check in with Dex and encouraged him to send

---

[5]    *See* AS 47.10.011(1) ("[T]he court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that . . . a parent . . . has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid."); AS 47.10.013 (describing examples of abandonment).

cards, letters, gifts, or pictures for Andie, but he did not. OCS worked with Dex to create a new case plan in June 2021 with the same goals: maintaining consistent contact with OCS, sending letters and pictures for Andie, and working towards permanency.

### C. Termination Trial

The superior court held a two-day termination trial in December 2021, hearing testimony from Amanda, Amanda's father, and three OCS caseworkers. Dex did not attend; his attorney represented that Dex wanted the trial to proceed in his absence.[6] Amanda testified that Dex never provided child support or money for living expenses and that Dex had limited contact with Andie even before the present case had begun. Amanda's father, who had been caring for Andie for almost five years, said the child was healthy and happy but did not know who Dex was, having had essentially no communication with him.

At the close of trial the superior court made oral findings. The court found that, over the nearly four years of the case, Dex "had little to no contact with the child and that was by his intent, not by any restrictions by OCS." It found that Dex had not sent letters, pictures, gifts, or financial or material support and credited Amanda's testimony about Dex's history of domestic violence. It cited Dex's inability to follow his case plan by staying in touch with OCS, his absence at the termination trial, and his profane email to OCS, which it found "show[ed] [Dex] had no desire to reunify with the child." Dex's occasional mention of seeking visitation was insincere, the court found, because he never followed up on any of those requests. It found that "OCS did all [it] reasonably could under the circumstances to make efforts."

The court found by clear and convincing evidence that Dex had abandoned

---

[6] A trial had been scheduled for January 2021, but Dex did not appear. The superior court recognized that Dex had never been fully advised of his right to counsel, so the court appointed counsel and continued the trial several times until December 2021.

Andie;[7] that Dex had not remedied his conduct; and that OCS had made "reasonable and active efforts" to offer Dex appropriate services. It found by a preponderance of the evidence that terminating Dex's parental rights was in Andie's best interests. Dex appeals.

## III.   DISCUSSION

Dex argues that the court clearly erred in finding that he abandoned Andie and erred in concluding that OCS made reasonable efforts to reunify him with Andie.[8]

### A.   The Superior Court's Abandonment Finding Was Not Clearly Erroneous.

#### 1.   The superior court made sufficient factual findings to permit meaningful appellate review.

Dex argues that the superior court did not make sufficient factual findings to support the conclusion that he abandoned his daughter and that, regardless, the record did not support this conclusion. Alaska Statute 47.10.013(a) defines abandonment in general terms and lists eight types of conduct that amount to abandonment unless the parent had "justifiable cause" for the conduct.[9] A single adequately supported finding

---

[7]    The court noted that OCS focused solely on abandonment but commented that there was sufficient evidence to support other theories as well.

[8]    In his reply brief, Dex first raises the argument that this case "was in fact a Custody Dispute Between the Maternal Grandparents and Father." To the extent this is meant to be a distinct legal argument for why AS 47.10.011(1) and AS 47.10.013 do not properly apply to this case, it was waived by not being made in Dex's opening brief. *See Barnett v. Barnett*, 238 P.3d 594, 603 (Alaska 2010) ("[W]e deem waived any arguments raised for the first time in a reply brief . . . .").

[9]    AS 47.10.013(a) (defining abandonment to mean when a parent "has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision").

is sufficient to establish abandonment.[10]

A superior court's findings must be sufficient to support meaningful appellate review.[11] When the written findings are largely conclusory, the court must make oral findings that are sufficiently detailed to explain the basis for the court's decision and to enable meaningful review.[12] We review whether a superior court has made sufficient factual findings using our independent judgment.[13] We review the factual findings themselves for clear error, viewing the record in the light most favorable to the prevailing party.[14]

The superior court found that Dex abandoned Andie in four ways: (1) having "made only minimal efforts to support and communicate" with her; (2) "fail[ing] . . . for a period of at least six months to maintain regular visitation;" (3) "fail[ing] to participate in a suitable plan" for reunification; and (4) being "unwilling to provide care, support, or supervision" for her.[15] Although Dex argues the superior court made findings that were simply a "verbatim recitation" of the statute, the court actually made a number of factual findings:

- Dex had "little to no contact with [Andie] and that was by his intent,

---

[10]     *Trevor M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 368 P.3d 607, 610 (Alaska 2016).

[11]     *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 266 (Alaska 2019).

[12]     *Id.* at 267.

[13]     *See id.* at 266-67.

[14]     *Steve H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 109, 112 (Alaska 2019).

[15]     *See* AS 47.10.013(a)(2-4), (8).

not by any restrictions by OCS";

- Dex had moved out of state;

- Dex "would not stay in touch with OCS," and OCS often had to search for new contact information;

- Dex was "rarely available";

- Dex never sent letters, pictures, gifts, or financial support for Andie;

- Dex sent a profane email to OCS indicating his disinterest in reunifying with his daughter; and

- when OCS "tried to simply institute the most basic things of contact," Dex "wouldn't do it."

A trial court's factual findings need not be extensive, but must either give us a "clear indication of the factors which the superior court considered important in exercising its discretion" or "allow us to glean from the record what considerations were involved."[16]  These findings are just enough to satisfy that requirement.

### 2. The superior court did not clearly err by finding that Dex abandoned Andie.

As noted above, a finding that a parent committed the conduct under any subsection of AS 47.10.013(a), without justifiable cause, is sufficient to establish that the child is in need of aid due to abandonment.[17]  We therefore focus on just one of the grounds on which the superior court found abandonment:  Dex made only minimal efforts to support and communicate with Andie.[18]

---

[16]  *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139 (Alaska 1997).

[17]  *Trevor M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 368 P.3d 607, 610 (Alaska 2016).

[18]  *See* AS 47.10.013(a)(2).

Dex challenges the superior court's findings as "inapt" or contradicted by the record. However, he does not argue in his briefing that he actually provided financial support for Andie or tried to do so, and Amanda's testimony that Dex provided no financial or material support for Andie since moving away from Alaska is undisputed. And although Dex does take issue with the court's factual findings about his communication, he mainly argues that his failure to support and communicate with Andie was justifiable.

Dex does not directly explain why his failure to provide any support for Andie was justifiable, but he suggests it was justified by the fact that he left Alaska to attend school. Yet attending school out of state does not justify the total failure to contact or support one's child.

Dex also suggests his lack of contact and support was justifiable because OCS never intended to reunify him with Andie. He mentions the June 2020 hearing in which an OCS attorney, when asked by the court when Andie's case would be ready for a termination trial, explained that the parties first "ha[d] to perfect the case on [Dex]," and that to proceed with guardianship "[they] need[ed] to remove [Dex] from the picture." These statements do not show that OCS had it out for him. Read in context, they simply show that after two years of Dex not staying in contact with OCS or his daughter, OCS decided it was necessary to terminate his parental rights in order to achieve permanency for Andie. Nothing in OCS's statements justified Dex's lack of contact or support.

To further support his assertion that OCS's asserted goal of reunification was a sham, Dex claims that although he tried to stay in touch with OCS, his calls went unreturned. There is no support in the record for this assertion beyond Dex's statement at a December 2020 pretrial hearing that he had difficulty reaching OCS. But that

statement was not admitted into evidence,[19] and during the same conference Dex admitted he had "been in contact with OCS plenty of times" and that his calls to OCS were returned.

In fact, the record strongly supports the superior court's finding that Dex "would not stay in touch with OCS" and "would rarely provide information that OCS could use to reunify this family." Amanda told OCS that Dex often changed his name on social media. OCS caseworkers testified that they tried unsuccessfully to reach Dex for over a year and a half with phone calls and social media searches. OCS offered Dex telephonic visitation, but Dex never followed up, falling out of contact with the agency for months despite receiving monthly voicemails and having his caseworker's contact information. The superior court's finding that Dex failed to stay in contact with OCS is not clearly erroneous.

Dex argues that the superior court misinterpreted his profane email to OCS. The court found that the email "was [Dex's] way of saying he doesn't care if his rights are terminated, he's not going to participate in the proceedings[,] he wants nothing to do with Andie." We agree that the court likely misinterpreted the email: Dex *does* express a desire to have a relationship with Andie. But the misreading of the email does not affect the court's independent finding that Dex had not taken any of the necessary steps to reunite with Andie and therefore had abandoned her.

Next Dex argues that his lack of contact with Andie was justifiable because OCS placed unreasonable restrictions on his ability to communicate with her. He admits that he never sent Andie letters or gifts, but contends that was because "he wanted to have a real relationship with her, to raise her, and, in the meantime, to communicate with

---

[19]     *See Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 n.32 (Alaska 2019) (declining to consider evidence not admitted at termination trial).

her meaningfully and regularly via [video]." He essentially takes issue with OCS's visitation plan and implies that his failure to communicate in the way OCS required was "justifiable" and therefore precludes a finding of abandonment.

There is no question that OCS limited Dex's contact with Andie. Yet Dex did not pursue the contact that OCS allowed. When OCS offered to set up supervised telephonic contact with Andie before progressing to video contact through Amanda's parents, Dex did not contact the assigned caseworker again for months despite having her contact information and receiving monthly voice messages. A similar situation occurred in 2021 when OCS encouraged Dex to send cards or letters to work toward video visitation, but Dex failed to do so. Dex's assigned caseworker testified that while Dex had discussed visitation — and she "truly believe[d] he would like to have contact" with Andie — he had not followed through with the basic steps needed to work towards regular visitation.

We cannot say that OCS's approach to contact was unreasonable. We defer to OCS's judgment on matters in its discretion.[20] OCS has a statutory duty to provide "reasonable visitation," and to determine what visitation is reasonable it must "consider the nature and quality of the relationship that existed between the child and the family member before the child was committed to [OCS] custody."[21] An OCS caseworker testified that it is preferable to start contact between absent parents and toddlers gradually, with cards or letters. Andie was a very young child during the life of this case

---

[20]    *See In re B.L.J.*, 717 P.2d 376, 380-81 (Alaska 1986); *cf. Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1071 n.25 (Alaska 2018) (recognizing OCS discretion in prioritizing services provided to a parent); *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 432 (Alaska 2012) (same).

[21]    AS 47.10.080(p).

and had had little contact with Dex, and OCS had reasonable concerns about how Dex would behave in real-time communications. Beginning with letters, cards, and pictures and supervised telephone visitation before moving to unsupervised video contact was a reasonable approach to introducing Dex back into Andie's life.[22]

We also reject Dex's suggestion that his disagreement with OCS's limits on contact made his failure to engage in any contact "justifiable." It is understandable that Dex would be frustrated by OCS declining video contact with Andie at the outset, but that frustration is not "justifiable cause" for his refusal to communicate with Andie in the ways allowed by OCS to build the relationship with his child.

Finally, Dex argues his case benefits from comparison to *Cordelia P. v. State, Department of Health & Social Services, Office of Children's Services*, in which we affirmed the superior court's abandonment finding because the mother failed to attend any scheduled visits or complete any case plan services.[23] Because OCS never scheduled any visits or identified any services on his case plan, Dex argues, he should not be found to have abandoned Andie. But OCS did not schedule visitation or identify services for Dex due to his failure to take the initial steps to build a relationship with Andie and to stay in touch with OCS. The comparison to *Cordelia P.* is inapposite. Dex fails to establish any clear error in the superior court's finding that he abandoned Andie.

---

[22]     Dex highlights testimony by a caseworker that she told Dex "if he wanted to set up doing telephonic visits that it would have to be through OCS with me setting up the phone and being on the line," and that OCS "didn't have the capability of doing FaceTime." It is not apparent from the record why OCS would lack the capability to facilitate some kind of video chat. However, the caseworker went on to explain that if the initial phone visits went well, "the intention would be then to possibly allow FaceTime visits directly through" the foster parents. Thus it is clear that OCS contemplated moving to video chat eventually, and its overall approach of starting with limited supervised contact is not unreasonable.

[23]     No. S-17989, 2021 WL 5502923, at *4 (Alaska Nov. 24, 2021).

**B.     The Superior Court's Reasonable Efforts Finding Was Not Clearly Erroneous.**

The superior court may not terminate parental rights unless it finds by clear and convincing evidence that OCS made reasonable efforts to provide family reunification services.[24] Dex contends that the superior court failed to make sufficient factual findings to support its reasonable efforts finding and that the record cannot support a finding of reasonable efforts.

The superior court's findings were adequate to "give us a clear indication of the factors which the superior court considered important in exercising its discretion."[25] The superior court found:

- that OCS tried to get Dex's new contact information "many times" over the case;
- that the agency encouraged Dex to send letters, cards, and pictures to Andie;
- that Dex chose to rarely appear in court;
- that OCS's case plans considered Dex's lack of engagement and requested that he stay in contact, but that he did not;
- that Dex never followed up on requests for visitation; and
- that OCS did "all [it] reasonably could under the circumstances to make efforts" towards reunification.

These findings are sufficiently detailed to permit meaningful appellate review.

Next Dex argues that the efforts OCS made to reunify him with Andie were inadequate. OCS has a duty to "make timely, reasonable efforts to provide family

---

[24]     AS 47.10.086; AS 47.10.088.

[25]     *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139 (Alaska 1997).

support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child . . . ."[26] OCS's efforts "must be reasonable but need not be perfect."[27] In determining the reasonableness of OCS's efforts, we may consider all interactions between the parent and OCS as well as the entire history of services OCS has provided.[28] "A parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide."[29] Whether OCS made reasonable efforts is a mixed question of law and fact.[30]

Dex argues that OCS never identified for him problems to address or offered him services. The record does not support this assertion. At the outset of the case, OCS prepared a case plan for Dex recommending domestic violence awareness training and a domestic violence assessment. The assigned caseworker testified she looked into services offered in the Phoenix region where he was living. And later in the case, when another caseworker offered services, Dex declined them by stating that he did not need help. In response to Dex's unwillingness to engage in services and difficulty staying in touch, OCS modified his case plan's goals to making contact with OCS, sending letters and pictures for Andie, and working with OCS on Andie's permanency. The OCS caseworkers all testified about the efforts they put into reunifying Dex and

---

[26] AS 47.10.086(a)

[27] *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[28] *Annette H. v. State, Dept. of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 268 (Alaska 2019).

[29] *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011).

[30] *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013).

Andie, including developing case plans; trying to contact Dex on a regular basis; providing a visitation plan that Dex never complied with; and encouraging Dex to send Andie letters and gifts.

Dex also argues that OCS's efforts were not reasonable because of the limits they placed on his contact with Andie, asserting that OCS never offered or arranged a visit between him and Andie. He criticizes OCS's requests that he write letters and send pictures as a "stubborn and silly tact" that he argues was "per se unreasonable." He argues that even an OCS caseworker admitted that video visits would have been preferable.

We are not persuaded that OCS's approach to visitation was unreasonable. In light of the foster parents' reluctance to facilitate visitation directly with Dex (due to his previous threats against them), OCS offered to supervise telephonic visitation between Dex and Andie. As noted above, it is not clear from the record why, according to the caseworker's testimony, OCS lacked the ability to provide supervised video contact. But it is clear from the record that OCS proposed to move to unsupervised video contact eventually, and we cannot say its approach was unreasonable. When OCS offered this progression from telephonic visits to eventual video visits, Dex disappeared for months and did not contact OCS. Later in the case, after Dex had not had contact with Andie for well over a year, OCS encouraged Dex to send cards or letters to Andie as a step toward greater contact, but he failed to do so. Requiring an absent parent to show some commitment to being a part of a young child's life before moving to real-time communication is a reasonable approach to visitation that avoids the risk of confusing or upsetting the child. Dex's unwillingness to participate in this plan is the reason why his contact with Andie never progressed and is fatal to his argument that OCS's unwillingness to allow more contact amounts to a lack of reasonable efforts.

Finally, Dex's case is not at all like *Jerome S. v. State, Department of*

*Health & Social Services, Office of Children's Services*, in which we vacated the termination of parental rights due to lack of efforts.[31]  For one thing, that case was governed by the Indian Child Welfare Act's more demanding "active efforts" standard.[32] Second, in that case the record showed that OCS "vacillated between periods of minimal efforts to reach and communicate with Jerome and long stretches of making 'no' efforts to communicate with him."[33]  OCS made far greater efforts to communicate with Dex in this case, and its efforts overall were reasonable.

## IV.    CONCLUSION

We AFFIRM the termination of parental rights.

---

[31]     S-18084, 2022 WL 1022032, at *6 (Alaska Apr. 6, 2022) (citing 25 U.S.C. § 1912(d)).

[32]     *See id.* at *1, *4.

[33]     *Id.* at *4.