NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

JENNIFER T.,                              )
                                          )   Supreme Court Nos. S-18544/18564
                        Appellant,        )   (Consolidated)
                                          )
        v.                                )   Superior Court No. 3SW-20-00004 CN
                                          )
STATE OF ALASKA, DEPARTMENT )   MEMORANDUM OPINION
OF FAMILY & COMMUNITY                     )       AND JUDGMENT*
SERVICES, OFFICE OF                       )
CHILDREN'S SERVICES,                      )   No. 1981 – August 9, 2023
                                          )
                        Appellee.         )
                                          )
───────────────────────────────          )
                                          )
RUSSEL T.,                                )
                                          )
                        Appellant,        )
                                          )
        v.                                )
                                          )
STATE OF ALASKA, DEPARTMENT )
OF FAMILY & COMMUNITY                     )
SERVICES, OFFICE OF                       )
CHILDREN'S SERVICES,                      )
                                          )
                        Appellee.         )
                                          )

        Appeal from the Superior Court of the State of Alaska, Third
        Judicial District, Kenai, Lance Joanis, Judge.

────────────────────────────────────────────────────────

        *       Entered under Alaska Appellate Rule 214.

Appearances: Lindsey Bray, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant Jennifer T. Olena Kalytiak Davis, Anchorage, for Appellant Russel T. Katherine Demarest, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

A mother and father appeal the termination of their parental rights, arguing that the Office of Children's Services (OCS) failed to make reasonable efforts to reunify their family, as required by statute. We conclude that OCS's efforts were reasonable and affirm the superior court's termination orders.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Events Before Removal

Jennifer and Russel[1] married in 2009. They had a son together later that year.[2]

Starting in 2014 Jennifer underwent seven surgeries in the span of a year and a half. She was prescribed a variety of pain killers, but she decided to abruptly end her use of the prescribed medications and began using heroin.

Jennifer found out she was pregnant in October 2019 but believed she had a miscarriage about one month later. A few months later, she again discovered she was pregnant. Believing that she had become pregnant after her miscarriage and was only

---

[1]    We use pseudonyms to protect the parties' privacy.

[2]    This child is currently in a guardianship and not a party to this termination proceeding.

a few months along, Jennifer did not seek immediate prenatal care. Five or six weeks later, Jennifer went into labor. A daughter, Hillary, was born full term in April 2020.

The staff at the hospital where Jennifer gave birth noted that she was "exceptionally sleepy and unable to stay awake when [staff] were talking to her." The hospital conducted a urinalysis (UA). The UA was negative for drug use, but testing revealed that the sample provided was not from a recently pregnant person. Hospital staff were concerned about the "questionable" UA result and Jennifer's lack of prenatal care, so they contacted OCS. OCS became concerned that Russel had provided Jennifer's sample.

After the UA Jennifer and Russel left the hospital with Hillary against medical advice. A sample of Hillary's meconium was also sent for testing. Jennifer and Russel left the hospital before the test results were received.

### 2. The Child's Removal

Hillary's meconium test came back positive for amphetamines, methamphetamines, and opiates. A caseworker then went to the hotel on the Kenai peninsula where Jennifer and Russel were staying and spoke to Russel about the positive test. The caseworker later testified that Russel told her that Jennifer had used drugs in the past but that the use had ended when she learned she was pregnant.

Jennifer and Hillary were not at the hotel, and the caseworker testified that police found them in a vehicle shortly after. The caseworker met a police officer and Jennifer at the vehicle. She took Hillary away from Jennifer while they were standing on the side of the road. Jennifer testified that the caseworker initially agreed to give Hillary solely to Russel, but that the caseworker then changed her mind before Russel arrived. Jennifer described the police officer "plucking [her] fingers off [Hillary's] car seat" while the caseworker took Hillary from her.

### 3. Efforts After Removal

Hillary was initially placed in a non-relative foster home on the Kenai peninsula. Because she was in a different community than her parents, OCS facilitated visitation by video.

After a few weeks, Hillary was placed with her maternal uncle and his partner in the Matanuska-Susitna (Mat-Su) valley at Jennifer's request. OCS did not consider placement with Russel to be appropriate because it had concerns that he provided Jennifer with the UA sample at the hospital and that he was also abusing substances.

Hillary's case had four different caseworkers after she was placed with her uncle.

The first caseworker made individual case plans with Jennifer and Russel in early July 2020. Both case plans had the same goals: complete a hair follicle test, participate in UA testing, schedule an intake at Seaview Mental Health Center (a behavioral health center) and sign a release of information, and maintain contact with OCS.

Upon OCS's referral both parents participated in counseling services at Seaview. Russel was discharged in March 2021 because he completed his 12 required sessions. Jennifer was discharged from the program in July for lack of compliance with and failure to attend the program.

OCS made referrals for both Jennifer and Russel to undergo drug testing, but neither parent substantially participated.[3] OCS did not refer them for further substance abuse evaluation or treatment. At trial a caseworker explained that OCS did not make those referrals because, due to the parents' denial of drug use, it needed them to undergo drug testing to determine whether they were in fact not using drugs.

---

[3] OCS set up over 20 UAs for both Jennifer and Russel. Jennifer did not attend any of the tests, and Russel only attended two.

Caseworkers testified that they attempted to maintain regular monthly contact with Jennifer and Russel but that the parents would often miss scheduled meetings. Most communication between the parents and the caseworkers was by telephone or email, rather than in person.

OCS initially facilitated visitation with Hillary in its Anchorage office. After Jennifer and Russel repeatedly failed to check in before visits, OCS moved visitation to Hillary's foster home in the Mat-Su valley. During the remainder of the case, visitation between Hillary and her parents occurred at the foster home. The foster parents expressed concerns that Jennifer and Russel would often arrive late or miss visits and sometimes appeared to be under the influence during visits.

Both parents told caseworkers that transportation problems kept them from working on their case plans. In response caseworkers offered them mileage reimbursement, cab fare reimbursement, and bus passes.

Partway through the case, a caseworker evaluated Russel's and Jennifer's progress on their case plans. The caseworker reported that both parents had participated in services "inconsistently," had not participated in UAs, had not maintained contact with OCS, and had not "mitigated the safety concerns that brought [Hillary] into custody." The caseworker also updated both parents' case plans. She reported that neither parent worked with her to update the case plans or go through the evaluations despite OCS's attempt to encourage the parents to collaborate in the process.

There is some uncertainty in the record about whether a caseworker was assigned to the parents' cases between April and July 2021. An OCS supervisor testified that she scheduled a meeting with Jennifer and Russel in May 2021, but neither parent showed up. By July 2021 a new caseworker had been assigned.

In September 2021 OCS petitioned for termination of Jennifer's and Russel's parental rights.

In December 2021 Jennifer was arrested for shoplifting and heroin possession. A few months later Jennifer and Russel were both arrested on other charges

and were incarcerated for most of April 2020. Due to these charges and Jennifer's earlier charges, she was incarcerated for most of April. Jennifer testified that she participated in UAs while incarcerated. A caseworker testified that Russel completed one UA after being charged, receiving a negative result.

**B.      Termination Proceedings**

A four-day trial was held in June and July 2022. After trial the superior court terminated both Jennifer's and Russel's parental rights.[4] The court found that Hillary was a child in need of aid based on clear and convincing evidence of abandonment, substance abuse, and neglect.[5] In support of its abandonment finding, the superior court found that both Jennifer and Russel had "shown a conscious disregard of parental responsibilities toward [Hillary] by failing to provide reasonable support, maintain regular contact, or provide normal supervision in considering the child's age and need for care by an adult." It also found they had failed to engage in their case plans. The court found that Jennifer faked her UA at the hospital, which showed that "the issue from the beginning [was] substances," but, despite having case plans developed for them, the parents did not work with OCS. And the court found that their behavior only started to change "a little bit" at the end of the case.

The court found that both parents had participated in services "inconsistently," and it listed things the parents could have done: obtained UAs, attended more visits, and signed releases of information so OCS could check on their progress. The court stated that Jennifer could have participated in the recommended services for substance abuse and found that it was "clear to the [c]ourt that [Russel] was using" because he failed to participate in drug testing.

---

[4]      AS 47.10.088 (permitting court to terminate parental rights if child is a child in need of aid, parent has failed to remedy conduct that put child at substantial risk of harm, and OCS has made reasonable efforts).

[5]      AS 47.10.011(1), (9), and (10).

Regarding substance abuse the superior court found that Jennifer used heroin both while pregnant and after Hillary was born. As evidence of Jennifer's substance abuse, the court pointed to the positive meconium test, her failure to complete the UAs OCS recommended, and her recent criminal charges. The court found that Jennifer's "ability to parent ha[d] been substantially impaired by the addictive or habitual use of an intoxicant. And that . . . use of an intoxicant resulted in the substantial risk of harm to the child."

The court noted that abandonment was "the stronger subsection regarding [Russel's] failure" to engage with his case plan. But it found that the 21 UAs Russel failed to participate in and his recent felony charges also supported a finding of substance abuse under subsection (10).

The court reasoned that all its findings for abandonment and substance abuse also supported a finding of neglect.

The court then found that both parents had failed to remedy the conduct that had placed Hillary at risk of harm. The court found that Jennifer and Russel tried to address their substance abuse without help from OCS because they were afraid that accepting help would be used against them. The court found that while there was some testimony that the parents were beginning to change their behavior, they had not actually achieved the necessary change.

The court found by clear and convincing evidence that OCS made reasonable efforts to enable Hillary's safe return.[6] The court pointed to the services and referrals OCS provided: substance abuse assessments and treatments, mental health diagnosis, transportation assistance, referrals for drug tests, visitation with Hillary, case planning, and, generally, monthly contact from a caseworker. But the court found that

---

[6]     AS 47.10.086(a) (requiring OCS "make timely, reasonable efforts to provide family support services . . . to enable the safe return of the child to the family home").

both parents failed to participate in their case plans, undergo drug testing, or consistently visit Hillary. The court ultimately found it was in Hillary's best interests to terminate Jennifer and Russel's parental rights. Both parents appeal.

## III. DISCUSSION

OCS has a duty to make reasonable efforts "to prevent out-of-home placement of the child or to enable the safe return of the child to the family home."[7] To do so it must "identify family support services," actively offer such services to the parent by referring the parent to and providing information on the services, and document its actions.[8] When determining if efforts were reasonable, we consider both the actions of the parent and OCS's efforts in their entirety.[9] "A parent's demonstrated unwillingness to participate in treatment may be considered in determining the reasonableness of state efforts."[10] "The efforts that OCS makes must be reasonable but need not be perfect."[11]

"Whether OCS has made reasonable reunification efforts is a mixed question of law and fact."[12] "In child in need of aid cases a superior court's factual findings are reviewed for clear error."[13] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been

---

**7**    AS 47.10.086(a).

**8**    *Id.*

**9**    *Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 347 (Alaska 2006).

**10**    *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008).

**11**    *Id.*

**12**    *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 949 (Alaska 2013).

**13**    *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 427 (Alaska 2012).

made.' "[14]  "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[15]  We "review de novo whether a [superior] court's findings satisfy the requirements of the child in need of aid statute."[16]

**A.  The Superior Court Did Not Err By Determining That OCS Made Reasonable Efforts Towards Jennifer.**

Jennifer argues that OCS's efforts were not reasonable because the agency failed to consider the circumstances of her particular case, failed to follow its own policies, and failed to develop a relationship with her.  We disagree.

Jennifer does not challenge the superior court's factual findings regarding reasonable efforts[17] — that OCS offered substance abuse assessments and treatments, transportation assistance, drug testing, and visitation with Hillary.  Nor does she challenge the court's factual findings about her refusal to participate in the reunification plan that OCS created.  Instead she challenges the legal sufficiency of OCS's efforts.

OCS's efforts "need only be reasonable under the circumstances," which depends on the history of services OCS has provided, the parent's willingness to

---

[14]     *Id*. at 427-28 (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[15]     *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008).

[16]     *Barbara P.*, 234 P.3d at 1253.

[17]     Jennifer does challenge one factual finding made by the superior court — that she did not sign a release of information for OCS to access her Seaview records. Although the superior court initially stated that Jennifer and Russel had not provided a release of information, it later walked the finding back.  The superior court did not mention the release of information when discussing the reasonableness of OCS's efforts.  It did mention that the parents had likely not signed a release when analyzing the best interests of the child, but neither parent challenged the superior court's best interests finding.  Any error on this point was harmless.

participate in substance abuse treatment, and the parent's overall cooperation.[18] "[W]e have repeatedly held that a brief lapse in OCS's provision of services does not foreclose a finding that OCS made reasonable efforts toward reunification."[19]

First, Jennifer argues that OCS failed to consider her assertedly unique barriers in her case plan; specifically, the difficulty of traveling from her home on the Kenai peninsula to Hillary's foster home in the Mat-Su valley for visitation. It is true that transportation was not specifically mentioned in the case plans. But caseworkers did offer Jennifer assistance with transportation.

Jennifer also mentions unique communication barriers caused by the pandemic and the fact that she, Hillary, and the caseworkers were all in different locations. But she does not specify how this affected her case beyond her claim that she had insufficient in-person contact. Although it is true that Hillary's foster home was a long drive from where Jennifer was living, it was Jennifer who requested that Hillary be placed in her brother's and his partner's care in the Mat-Su valley. And caseworkers testified that when they could not meet face-to-face with Jennifer, they regularly tried to contact her through emails, texts, or phone calls, but often would not hear back from her until days later, if at all. There was a months-long gap between caseworker visits at one point, but the superior court found that OCS scheduled a meeting with the parents during this period and neither parent attended. OCS's efforts to reunite Jennifer and Hillary were reasonable despite logistical barriers.

---

[18]     *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015).

[19]     *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 646 (Alaska 2013)*; see, e.g., Louis C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-18002, 2021 WL 5356514, at *4-5 (Alaska Nov. 17, 2021) (affirming reasonable efforts finding despite "[g]aps in OCS's efforts" during two periods of around five months when father was incarcerated).

Second, Jennifer argues that OCS did not comply with its own policy manual. She points out that OCS did not refer her to drug testing for a period of 15 months and that it is OCS policy to conduct a case plan evaluation every six months and to meet face-to-face every month.[20] Caseworkers completed only two case plan evaluations for Jennifer and had infrequent face-to-face contact due to COVID and the fact that, for most of the case, Jennifer lived in a different community than the caseworker assigned to her case.

OCS's failure to comply with some of its own policies does not preclude a finding that its efforts were reasonable.[21] Even if OCS failed to strictly comply with its own drug testing policies, its efforts to engage Jennifer in drug testing were reasonable in light of OCS's referrals and her non-participation. OCS's efforts "must be assessed 'in light of the circumstances' of the case.[22] This "can include a parent's unwillingness to participate in treatment," although a parent's reluctance is not the only

---

[20]     *State of Alaska, Dep't of Family & Cmty. Servs., Off. of Child.'s Servs., Child Protective Services (CPS) Manual with Combined CPS Procedural Manual for OCS Staff Use* (*CPS Manual*), at 100, 117 (July 1, 2022).

Jennifer argues that OCS failed to provide a family contact plan. Although there is no evidence in the record of a written family contact plan, the purpose of the family contact plan is to "provide guidelines" for and facilitate "frequent family contact" between a child in out-of-home placement and the child's family. *Id.* at 396-97. Caseworkers fulfilled this underlying purpose by consistently attempting to make contact with Jennifer and facilitate visitation with Hillary. Any failure to create a written contact plan in these circumstances did not make OCS's efforts unreasonable. *See Kendra H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17340, 2020 WL 2464851, at *7 (Alaska May 13, 2020) (holding OCS's failures to comply with some internal policies did not preclude finding that efforts were reasonable).

[21]     *Kendra H.*, 2020 WL 2464851, at *7.

[22]     *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 268 (Alaska 2019) (quoting *Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 259 (Alaska 2013)).

factor a court should consider.[23] Jennifer did not participate in regular drug testing, which was essential to show OCS that she was not using illegal drugs. OCS made over 20 UA referrals for Jennifer, but she never participated in testing. Although UA referrals were only offered during portions of the case, Jennifer did not show that she was willing to undergo testing when the referrals were offered.

OCS's efforts to contact Jennifer and arrange visitation were reasonable. Caseworkers developed case plans for each parent. Caseworkers also testified that they offered various solutions when Jennifer and Russel identified transportation as a problem. And although OCS at times let the foster parents coordinate visitation between Hillary and her parents, caseworkers testified they met regularly with the parents and worked to ensure visitation with the child occurred. Additionally it was reasonable for OCS to depart from its policies regarding in-person contact in order to protect families and staff during the early days of the COVID-19 pandemic.

Third, Jennifer argues OCS did not make reasonable efforts to develop a relationship with her or follow best social work practices in the way it treated her. She concedes she was reluctant to work with OCS but blames this reticence on the caseworkers' lack of empathy toward her and the traumatic removal of Hillary. At trial Jennifer described how OCS and the police forcibly removed Hillary from her care on the side of the road while she asked them to wait for Russel to come take custody. The superior court acknowledged that the removal was "very intense." We too acknowledge that separating a child from the parents is often a "traumatic and emotionally damaging experience."[24] Based on the limited record we have of the incident, we cannot determine whether the removal was undertaken with appropriate care and empathy. But even if it was not, OCS's subsequent attempts to work with Jennifer towards

---

[23] *Id.*

[24] *In re S. D.*, 549 P.2d 1190, 1199-1200 (Alaska 1976).

reunification were appropriate and reasonable. There is no evidence that OCS acted without sufficient empathy or professionalism after the removal. A harsh removal, by itself, does not defeat otherwise reasonable OCS efforts at reunification.

Jennifer also argues that the high caseworker turnover and requirement of regular drug testing exacerbated her unwillingness to work with OCS. The high turnover at OCS is regrettable, but the caseworkers testified that they attempted to maintain regular contact with Jennifer. Yet Jennifer would only communicate with the caseworkers sporadically, hampering their ability to develop a positive working relationship with her. Contrary to Jennifer's assertion, the case plan's requirement that she participate in drug tests was not intended to "catch" her abusing drugs. At trial OCS explained that drug tests were an important step in beginning substance abuse treatment or in demonstrating that the parents were no longer actively using substances. Requiring drug testing was not punitive; it was an essential aspect of the plan to determine whether Hillary could be safely reunited with her parents.

Despite Jennifer's reluctance to work with OCS, the agency made efforts to reunify Jennifer and Hillary by offering a variety of services, maintaining regular contact with Jennifer, and ensuring visitation with Hillary. OCS considered the barriers Jennifer faced and made efforts to help her overcome them. We therefore affirm the superior court's determination that OCS made reasonable efforts towards Jennifer.

**B.** **The Superior Court Did Not Err By Determining That OCS Made Reasonable Efforts Towards Russel.**

Throughout this case OCS made efforts to reunite Russel with Hillary. Caseworkers referred him to counselling at Seaview, regularly referred him to drug tests, offered him transportation assistance, facilitated visitation with Hillary, scheduled case planning meetings, and attempted to maintain contact with him through texts, calls, and emails. Russel maintains these efforts were deficient in two ways.

First, Russel argues that OCS failed to make reasonable efforts to prevent Hillary from being placed in foster care because it did not place Hillary with him. He

asserts that it was Jennifer's substance abuse, not his behavior, that was cause for concern.

OCS acted reasonably when it declined to place Hillary with Russel. OCS had reason to believe that Russel helped Jennifer falsify her UA at the hospital by providing a sample of his own urine and that he may have been using substances himself. The superior court found probable cause to keep Hillary in emergency custody based *both* on Jennifer's substance abuse and Russel's suspected attempt to hide Jennifer's drug use. Throughout the remainder of the case Russel regularly failed to establish his sobriety by declining to participate in drug testing.[25] OCS's decision not to place Hillary with Russel was reasonable.[26]

Second, Russel argues that OCS failed to work with him after Hillary's removal. Russel asserts that OCS witnesses from Beacon, Seaview, and Homer Medical Center testified and offered evidence pertaining exclusively to Jennifer. Not so. The Beacon records keeper authenticated records of 23 UAs that Russel was referred for by OCS, only two of which Russel attended. Similarly the Seaview records keeper authenticated records of Russel's sessions at Seaview. The Homer Medical

---

[25] Russel argues "there was no clear and convincing evidence of Russel's drug use prior to or after the removal." But Russell missed multiple UA appointments, which can reasonably support the inference that he was using drugs. *See Casey K. v. State, Dep't of Health & Soc. Servs.*, 311 P.3d 637, 644 (Alaska 2013).

[26] Further, Russel's argument suggests that if OCS did not make reasonable efforts to prevent Hillary's out-of-home placement, no amount of efforts after removal would satisfy the reasonable efforts requirement. But that is not true. An early failure by OCS to engage in reasonable efforts can be overcome if OCS's efforts, viewed in their entirety, were reasonable. *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003); *see also Darwin B. v. State, Dep't of Health & Soc. Servs.*, No. S-16211, 2017 WL 65547, at *3 (Alaska Jan. 4, 2017) (affirming finding that OCS made reasonable efforts despite early failures to communicate with parties).

Center worker testified only about Jennifer, but that is because only Jennifer participated in treatment through that facility.

Russel points to testimony from a caseworker that the caseworker was "texting with Jennifer most of the time." But the caseworker explained that Russel and Jennifer shared an email address and, although they initially had separate phones, began sharing one phone later in the case. The caseworker testified that he attempted to maintain contact with both parents, but that when he texted their shared phone number, he believed that it was Jennifer, rather than Russel, who was texting him back. Russel offers two other examples of instances he believes show that OCS was communicating exclusively with Jennifer rather than him. But both instances were conversations Jennifer initiated with OCS, so the caseworkers were merely describing their responses to her. The caseworkers' testimony described efforts to get in contact with both parents, not just Jennifer. The fact that OCS's efforts toward Russel were similar to its efforts toward Jennifer does not, in and of itself, make the efforts toward Russel unreasonable.

Russel's attempt to liken this case to our decision in *Jerome S. v. State, Department of Health & Social Services, Office of Children's Services*[27] is unpersuasive. The child in that case was an "Indian child" under the Indian Child Welfare Act (ICWA), so the heightened "active efforts" standard applied.[28] The father in *Jerome S.* had been incarcerated for much of the case, and OCS went nearly two years before discussing the father's case plan with him or provide visitation.[29]

Russel's situation is different. Caseworkers worked with him to develop his case plan from the beginning of the case. They referred him to rehabilitative services. They regularly facilitated visitation between him and Hillary.

---

[27]    No. S-18084, 2022 WL 1022032 (Alaska Apr. 6, 2022).

[28]    *Id.* at *1, *4.

[29]    *Id.* at *1-2.

The superior court did not err by considering Russel's failure to participate in his case plan as one factor in the reasonable efforts analysis. Russel cites *Bill S. v. State, Department of Health & Social Services, Office of Children's Services*[30] and *Mona J. v. State, Department of Health & Social Services, Office of Children's Services*[31] to support his claim that OCS was obligated to make an uncompromising effort to overcome his noncooperation. *Mona J.* applied *Bill S.* and held that a parent's non-cooperation does not obviate OCS's responsibility to make *active* efforts in an ICWA case.[32] We have previously declined to extend *Mona J.* to reasonable efforts in cases to which ICWA does not apply.[33] When evaluating whether OCS's efforts were reasonable, the efforts "must be assessed 'in light of the circumstances' of the case, which 'can include a parent's unwillingness to participate in treatment.'"[34] Under the reasonable efforts standard, OCS should try to persuade a reluctant or uncooperative parent to participate in rehabilitative services, but its "obligation does not extend to *forcing* an uncooperative or unwilling parent to engage in services."[35]

This is not a case where OCS is attempting to excuse deficient efforts by overemphasizing a parent's non-cooperation. Caseworkers regularly attempted to schedule meetings with Russel, refer him to drug tests, and communicate with him through texts, calls, and emails. Despite these efforts Russel still failed to take the steps required for reunification. The efforts OCS made toward Russel were reasonable,

---

[30]   436 P.3d 976 (Alaska 2019).

[31]   511 P.3d 553 (Alaska 2022).

[32]   *Id.* at 556, 562, 564.

[33]   *Jimmy E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 529 P.3d 504, 522 n.90 (Alaska 2023).

[34]   *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 268 (Alaska 2019) (quoting *Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 259 (Alaska 2013)).

[35]   *See id.*(emphasis added).

especially in light of his unwillingness to participate in drug testing to demonstrate his sobriety.

## IV. CONCLUSION

We AFFIRM the superior court's order terminating Jennifer's and Russel's parental rights.